## Louisville & N. R. Co. v. Cayce.

(Decided Jan. 11, 1938.)

ASHBY M. WARREN, J. MILLER WHITE, S. Y. TRIMBLE and S. Y. TRIMBLE, IV, for appellant.

FRANK A. RIVES and A. H. CLARK for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

C. B. Cayce brought this action against the Louisville & Nashville Railroad Company to recover $1,000 for personal injuries and $611 for damage done to his automobile and its contents. Recovery was predicated on the failure of the company to maintain a grade crossing in a reasonably safe condition. The trial resulted in

a verdict for $500 for damage to the car and $111 for damage to its contents. On motion of plaintiff the loss to the automobile was reduced $50, thus leaving the amount of the judgment $561. The company appeals.

The case has been ably and elaborately briefed, and we shall proceed to discuss the grounds urged for reversal.

Appellant's first insistence is that its motion for a peremptory should have been sustained. The evidence may be summarized as follows: Cayce is a traveling salesman, and was engaged in selling hats for the Pioneer Hat Company of St. Louis, and ties for the Metropolitan Tie Company of New York. Between 7 and 8 o'clock p. m. March 26, 1936, he was en route from St. Elmo to Hopkinsville over the Bradshaw road. Before reaching the Louisville & Nashville crossing he struck a mudhole and water got into his car.

After wiping off the car he waited a few minutes for it to dry. He then started the car and approached the railroad crossing. According to his story there was an incline up to the railroad track and he shifted to second gear and ran up on the track. The car made a rebound and skidded. It had rained the day before and he hit the wooden piece of the crossing and his car swerved down the track. He rammed on the brake and killed the motor. He stepped on the starter three times. Either the starter spring broke, or something, and the bell started ringing behind him. Looking up the track he saw the train coming. He jumped out and attempted to pull or push his car off the track. The train struck and demolished his car and destroyed the goods and merchandise he was carrying. When the engineer blew his whistle he jumped out, and the suction of the train set him down in the road. His lights were burning, and it was the first time that he had been over the road for two years. The reason he did not get across, he hit that piece of wood running out from the track and the car turned. He then put on his brake and stopped, and the car dropped off the plank on the crossing. He afterwards examined the planks and the planks did not go all the way across the road. They lacked about 4 feet of it. While driving he kept his car within the roadway where all the cars traveled. John White, on being asked whether all the planks were the same length on the side within the boundary of the highway toward Hop-

kinsville, said, "It is like I say, it lacks four feet of covering the road on this side and eight feet on the other side, you hit one piece there, and when you get off of that you hit the rail."

In answer to the question, "Do you mean the plank next to the rail on this side is the same in there?" he said, "It is only four and a half feet in there."

J. T. Garnett, who lived on the Bradshaw road, stated that the planks were from 3 to 8 feet short on the left-hand side, that is, the side toward Hopkinsville. The front wheels of an automobile traveling along the main portion of the road and over to the side next to Hopkinsville would go down to the crossties. In there there was nothing but one piece, and that piece extended from 3½ to 4 feet further than the remainder of the crossing. Robert Garnett, James Courtney, and G. B. Hord testified to substantially the same facts. J. E. White described the crossing in the following way:

"It goes—there is a good rise there, the light don't shine on the track until you get so near the track; if you had a little more space further from the track, and it was level, it would throw the light on the track, and you could see the crossing better."

A man going up there at night could hardly see it. The timbers on the crossing do not go out far enough toward town. They lack 4 or 5 feet.

On the other hand, J. B. Cochran, appellant's supervisor, testified as follows concerning the condition of the crossing:

"There are two sets of boards in there, the ends are butted up, they were twenty-four feet long originally, and they are bevelled for six inches on each end to keep anything from catching on the ends."

The distance from end to end is 24 feet. Seven of the boards are 24 feet and another one about 25½. They practically cover the distance between the rails. He inspected the crossing on the morning of March 26th and it was in good condition. In coming from Hopkinsville you take a curve to the right and go straight across the railroad, and then take a curve to the left, and head out the highway. For a vehicle traveling the highway as it is used there was available on the crossing for cars about 22 feet. Similar testimony was given by C. A. Pike, Robert May, section foreman, George Rawl-

ings, section laborer, and Jack White, section laborer. John White, witness for appellee, testified that the traveled part of the road goes almost to the pike, and then veers to the right, and then goes squarely across. The plank crossing is abundantly wide, if you notice what you are doing. The plank crossing between the rails is about 21 feet. J. T. Garnett testified that the road goes across the track at right angles, and if a man would follow the road there would be no trouble about getting across the crossing. Robert Garnett also testified that, if Mr. Cayce had followed the traveled road that travelers usually and customarily use, it would not have been possible for him to run off. According to J. W. Gadberry, who talked with Cayce after the accident, Cayce stated that his car was faulty and it went up there and stopped on him.

On behalf of appellant it is argued that the undisputed proof is that the timber between the rails and on the outside of the rails was in good condition, and that for vehicles traveling the highway as it was used there was from 21 to 22 feet of available space for passage. Attention is also called to some inconsistencies in the evidence of appellee. It is true that there was evidence to the effect that the planks covered that part of the highway in use, but there was other evidence that the planks were not properly located, that they extended about 4 feet beyond the metal toward Casky, but fell short of going out as far as the metal on the side toward Hopkinsville. It is also true that there is some confusion in the evidence of appellee, and also in the evidence of other witnesses, due to some extent at least to the fact that in giving their evidence the witnesses were testifying from a drawing or plat which helped to explain their evidence. Aside from all this, the crossing presents rather an unusual situation. As the road approaches the railroad it goes within a few feet of it and turns abruptly to the right, crosses over, and then turns to the left. In view of the danger of going off the traveled part of the road, a danger which the lights of a car would not reveal, it hardly can be said that planks extending across the traveled way only would make a suitable crossing. Aside from this the jury after hearing the evidence went to the crossing and saw for themselves the conditions there prevailing. There can be no doubt that the evidence was sufficient to take the case to the jury.

While appellee was on the stand he was asked, "Did you know that was a bad crossing?" and answered, "I did not." It is argued that this was error, as the question assumed that the crossing was a bad one, and suggested to the witness the answer which his counsel desired him to make. Doubtless the question was improper, but it hardly can be said that the error was so prejudicial as to require a reversal.

John White was permitted to state on cross-examination that the crossing was an incomplete one, while G. B. Hord was permitted to state that the crossing timbers on the side toward Hopkinsville were too short. Inasmuch as each of these witnesses had described the precise conditions existing at the crossing, we are not disposed to the view that their expressions of opinion that the crossing was incomplete, or the crossing toward Hopkinsville was too short, were calculated to prejudice the minds of the jurors.

In its concluding argument counsel for plaintiff stated to the jury that the court had refused to allow the jury to award the plaintiff any sum in compensation for his personal injuries, and for that reason the jury ought to give the full amount claimed by him on account of damages to his automobile and his hats, all of which were damaged in the accident complained of. Defendant's objection was overruled, the court saying to the jury "that that was simply the opinion of plaintiff's counsel." It is insisted that counsel thus violated the rule laid down in Stearns Coal & Lumber Company v. Williams, 177 Ky. 698, 198 S. W. 54, that it is highly improper to go out of the record in order to place before the jury irrelevant, incompetent, and prejudicial facts. It hardly can be said that the case is one where counsel went outside the record. The suit was to recover for personal injuries as well as for damages to the car and its contents. The court had instructed the jury, and the jury knew, without being told, that no instruction had been given authorizing a recovery for personal injuries. Therefore, the most that can be said of the argument is that it was without merit, and, as the court told the jury, was simply the opinion of counsel.

Instruction No. 1 is assailed not only on the ground that a peremptory should have gone, a question which we have heretofore considered, but on the ground that it furnished the jurors no guide for determining how

wide the crossing should be, and permitted them to determine as a matter of law what, in their opinion, was a suitable and reasonably safe crossing, irrespective of the width of the traveled portion of the highway. In the very nature of things the proper width of a crossing, as well as its suitability and safety, will vary with the circumstances of each case, and it would be a difficult undertaking for the court to tell the jury how wide a crossing should be, or to define what was a suitable and reasonably safe crossing. Therefore, it has always been the practice to submit these questions to the jury as was done in instruction No. 1.

Complaint is made of the court's refusal to give an offered instruction telling the jury that it was the duty of the plaintiff at the time of the alleged accident to have on the front of his car two lighted lamps of sufficient power clearly to reveal substantial objects at least 200 feet ahead, and it was his further duty to travel on the right side of the highway whenever possible, to drive his car in a cautious and prudent manner, and exercise reasonable care for his own safety, and that if they should believe that he failed in any of these duties and such failure was the proximate cause of the accident, the jury should find for the defendant. All the evidence showed that plaintiff's lights were burning, and that being true there was no evidence on which to base that part of the instruction. It is not claimed that any other car was approaching at the time, and in view of this fact and the further fact that the crossing was a very narrow one, we are not inclined to hold that, because plaintiff was not on the right side of the highway as he approached the crossing, he was guilty of contributory negligence as a matter of law. It follows that the offered instruction was properly refused.

Judgment affirmed.